70

# ⧣ 566711

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KENNETH L. HAYNES and
DARENDA A. HAYNES,

      Plaintiffs,

vs.

RYM TECHNOLOGY HOLDINGS, LLC, a
Michigan limited liability company, FELIX L.
DANIEL, SR., ANTHONY B. FIELDS,
DERRICK A. BEELER, RAY FLUKER,
FIRST FRANKLIN FINANCIAL CORP.,
subsidiary of NATIONAL CITY BANK OF
INDIANA, a Delaware corporation,
NATIONAL CITY BANK, a foreign banking
corporation, FIFTH THIRD BANK, a federal
banking corporation, SOURCE ONE
MORTGAGE CORPORATION, a Michigan
corporation, LAND OWNERS TITLE
AGENCY, INC., a Michigan corporation,
ROYAL MORTGAGE, INC., a Michigan
corporation, WAYNE SMITH, ARDRENA
SMITH, LYNN E. CARGILL and TIMOTHY
G. WEGMEYER

Wayne County Circuit Court
Case No: 07-732429-CH

Case: 2:08-cv-10358
Judge: Zatkoff, Lawrence P
Referral MJ: Hluchaniuk, Michael J.
Filed: 01-24-2008 At 01:43 PM
REM HAYNES V RYM TECH ET AL (RRH)

| | |
|---|---|
| Mark W. Hafeli (P28908)<br>HAFELI STARAN HALLAHAN CHRIST & DUDEK, P.C.<br>Attorney for Plaintiffs<br>4190 Telegraph Road, Suite 3000<br>Bloomfield Hills, MI 48302-2082<br>(248) 731-3083 | William G. Asimakis, Jr. (P46155)<br>Jordan S. Bolton (P66309)<br>CLARK HILL PLC<br>Attorneys for National City and First Franklin<br>500 Woodward Avenue, Suite 3500<br>Detroit, MI 48226<br>(313) 965-8300 |

TO THE JUDGES OF THE UNITED STATES DISTRICT COURT FOR THE EASTERN

DISTRICT OF MICHIGAN, SOUTHERN DIVISION:

## **JOINT NOTICE OF REMOVAL**

Defendants, National City Bank and National City Bank of Indiana, which through a merger, is the predecessor of National City Bank (collectively "National City") and First Franklin Financial Corporation ("First Franklin"), by and through their undersigned attorneys, show as follows:

1.  A civil action has been commenced and is now pending in the Circuit Court of Wayne County, Michigan, entitled:

KENNETH L. HAYNES and
DARENDA A. HAYNES,

   Plaintiffs,

vs.

RYM TECHNOLOGY HOLDINGS, LLC, a
Michigan limited liability company, FELIX L.
DANIEL, SR., ANTHONY B. FIELDS,
DERRICK A. BEELER, RAY FLUKER,
FIRST FRANKLIN FINANCIAL CORP.,
subsidiary of NATIONAL CITY BANK OF
INDIANA, a Delaware corporation,
NATIONAL CITY BANK, a foreign banking
corporation, FIFTH THIRD BANK, a federal
banking corporation, SOURCE ONE
MORTGAGE CORPORATION, a Michigan
corporation, LAND OWNERS TITLE
AGENCY, INC., a Michigan corporation,
ROYAL MORTGAGE, INC., a Michigan
corporation, WAYNE SMITH, ARDRENA
SMITH, LYNN E. CARGILL and TIMOTHY
G. WEGMEYER

and designated as Case No. 07-732429-CH in the files and records of said court.

2.  This lawsuit is a civil action for monetary damages against Defendants and is removable to this Court pursuant to 28 U.S.C. §§ 1331 and 1441(b), because Plaintiffs allege Defendants violated the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq. See,* Complaint, Count I at ¶¶ 47-56.

2

3.      As set forth in 28 U.S.C. § 1331, district courts of the United States have "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." Under 28 U.S.C. § 1441(b), "[a]ny civil action of which the district courts have original jurisdiction founded on a claim arising under... the laws of the United States shall be removable..."

4.      This action being one over which the district courts of the United States are given original jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), it may be removed to the district court of the United States for the district and division embracing the place where the action is pending. *See* 28 U.S.C. § 1441(a). That district and division is the Eastern District of Michigan, Southern Division.

5.      Under 28 U.S.C. § 1441(c), the remainder of Plaintiffs' claims, namely those brought for alleged fraud and breach of contract, those brought under the Michigan Consumer Protection Act, and those seeking cancellation of a mortgage and sheriff's deed are also removable to this Court.

6.      Plaintiffs' action against defendants was at the time they filed this action and is now an action over which the United States District Court is given original jurisdiction.

7.      This Notice is being filed with this Court within thirty (30) days after receipt by Defendant National City and First Franklin on January 14, 2008, of a copy of the Summons and Complaint setting forth the action which is the subject of this removal.

8.      A copy of the Summons and Complaint received by Defendants National City and First Franklin is attached to this Notice.

9.      Neither Defendant National City, nor Defendant First Franklin have filed pleadings in the Wayne County Circuit Court action.

3

10.    A copy of this Notice is being filed with the Clerk of the Circuit Court for the County of Wayne, State of Michigan.

11.    Defendants National City and First Franklin are thus removing this action to this Court for the reasons set forth above.

WHEREFORE, National City and First Franklin request that this Court assume full jurisdiction over this action as provided by law.

Respectfully submitted,

CLARK HILL PLC

By: _____
William G. Asimakis, Jr. (P46155)
Jordan S. Bolton (P66309)
500 Woodward Avenue, Suite 3500
Detroit, Michigan 48226-3435
(313) 965-8300
Attorneys for Defendants National City and
First Franklin

Dated: January 24, 2008

---

**PROOF OF SERVICE**

JULIE BARNES, HEREBY CERTIFIES THAT THE FOREGOING INSTRUMENT WAS SERVED UPON ALL PARTIES TO THE ABOVE CAUSE AND/OR TO EACH OF THE ATTORNEYS OF RECORD HEREIN AT THEIR RESPECTIVE ADDRESSES AS DISCLOSED ON THE PLEADINGS ON JANUARY 24, 2008

BY:    [X] U.S. MAIL    [ ] FACSIMILE    [ ] HAND DELIVERED

[ ] ELECTRONIC MAIL    [ ] FEDERAL EXPRESS

_____
JULIE BARNES

---

4

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KENNETH L. HAYNES and
DARENDA A. HAYNES,

Plaintiffs,

vs.

RYM TECHNOLOGY HOLDINGS, LLC, a
Michigan limited liability company, FELIX L.
DANIEL, SR., ANTHONY B. FIELDS,
DERRICK A. BEELER, RAY FLUKER,
FIRST FRANKLIN FINANCIAL CORP.,
subsidiary of NATIONAL CITY BANK OF
INDIANA, a Delaware corporation,
NATIONAL CITY BANK, a foreign banking
corporation, FIFTH THIRD BANK, a federal
banking corporation, SOURCE ONE
MORTGAGE CORPORATION, a Michigan
corporation, LAND OWNERS TITLE
AGENCY, INC., a Michigan corporation,
ROYAL MORTGAGE, INC., a Michigan
corporation, WAYNE SMITH, ARDRENA
SMITH, LYNN E. CARGILL and TIMOTHY
G. WEGMEYER

Wayne County Circuit Court
Case No: 07-732429 CH

Case: 2:08-cv-10358
Judge: Zatkoff, Lawrence P
Referral MJ: Hluchaniuk, Michael J.
Filed: 01-24-2008 At 01:43 PM
REM HAYNES V RYM TECH ET AL (RRH)

Mark W. Hafeli (P28908)
Hafeli Staran Hallahan Christ & Dudek, P.C.
Attorney for Plaintiffs
4190 Telegraph Road, Suite 3000
Bloomfield Hills, MI  48302-2082
(248) 731-3083

William G. Asimakis, Jr. (P46155)
Jordan S. Bolton (P66309)
Clark Hill PLC
Attorneys for National City Bank
500 Woodward Avenue, Suite 3500
Detroit, MI  48226
(313) 965-8300

## CERTIFICATE OF SERVICE

I hereby certify that on January 24, 2008, I served, via First Class Mail, Notice of Filing

Notice of Removal on behalf of National City Bank and National City Bank of Indiana and First

Franklin Financial Corporation upon counsel of record as follows:

Mark W. Hafeli, Esq.
4190 Telegraph Road
Suite 3000
Bloomfield Hills,  MI  48302-2082


Julie Barnes

JURY FEE PAID
DEC 07 2007

## STATE OF MICHIGAN
## IN THE WAYNE COUNTY CIRCUIT COURT

KENNETH L. HAYNES and
DARENDA A. HAYNES,

      Plaintiffs,

vs.

RYM TECHNOLOGY HOLDINGS, LLC., a
Michigan limited liability company, FELIX L.
DANIEL, SR., ANTHONY B. FIELDS,
DERRICK A. BEELER, RAY FLUKER,
FIRST FRANKLIN FINANCIAL CORP.,
subsidiary of NATIONAL CITY BANK OF
INDIANA, a Delaware corporation,
NATIONAL CITY BANK, a foreign banking
corporation, FIFTH THIRD BANK, a federal
banking corporation, SOURCE ONE
MORTGAGE CORPORATION, a Michigan
corporation, LAND OWNERS TITLE
AGENCY, INC., a Michigan corporation,
ROYAL MORTGAGE, INC., a Michigan
corporation, WAYNE SMITH, ARDRENA
SMITH, LYNN E. CARGILL and TIMOTHY
G. WEGMEYER,

      Defendants.

07-732429 CH 12/07/2007
JDG:KATHLEEN MACDONALD
HAYNES KENNETH L
     vs
RYM TECHNOLOGY HOLDINGS LLC

Case No. 07-   -CH

_____/

Mark W. Hafeli (P28908)
Hafeli Staran Hallahan Christ & Dudek, P.C.
Attorney for Plaintiffs
4190 Telegraph Road, Ste. 3000
Bloomfield Hills, Michigan 48302-2082
(248) 731-3083

_____/

A civil action between these parties or other parties arising out of
the transaction or occurrence alleged in the Complaint has been
previously filed in the Wayne County Circuit Court where it was
given docket no. 07-716668 AV and was assigned to Judge
Kathleen I. Macdonald. The action remains pending.

## COMPLAINT

NOW COME Plaintiffs, Kenneth L. Haynes and Darenda A. Haynes, by and through their attorney, and complain against the Defendants as follows:

1.  Plaintiffs, Kenneth L. Haynes and Darenda A. Haynes, are residents of Wayne County, Michigan.

2.  Defendant, RYM Technology Holdings, LLC, is a Michigan limited liability company operating and doing business in Wayne County, Michigan.

3.  Defendant, Felix L. Daniel, Sr., is a resident of Oakland County, Michigan.

4.  Defendant, Anthony B. Fields, is a resident of Oakland County, Michigan.

5.  Defendant, Derrick A. Beeler, is a resident of Oakland County, Michigan.

6.  Defendant, Ray Fluker, is a resident of Wayne County, Michigan.

7.  Defendant, First Franklin Financial Corp., ("First Franklin") is a subsidiary of National City Bank of Indiana and is a Delaware corporation operating and doing business in Wayne County, Michigan.

8.  Defendant, National City Bank, ("National City") is a foreign corporation operating and doing business in Wayne County, Michigan.

9.  Defendant, Fifth Third Bank, ("Fifth Third") is a federal banking corporation operating and doing business in Wayne County, Michigan.

10.  Defendant, Source One Mortgage Corporation, ("Source One") is a Michigan corporation operating and doing business in Wayne County, Michigan.

11.  Defendant, Land Owners Title Agency, Inc., ("Land Owners") is a Michigan corporation operating and doing business in Wayne County, Michigan.

12.  Defendant, Royal Mortgage, Inc., ("Royal") is a Michigan corporation operating and doing business in Wayne County, Michigan.

13.     Defendants, Wayne Smith and Ardrena Smith, are residents of Wayne County, Michigan.

14.     Defendant, Lynn E. Cargill, is an attorney operating and doing business in Macomb County, Michigan.

15.     Defendant, Timothy G. Wegmeyer, is an attorney operating and doing business in St. Clair County, Michigan.

16.     The amount in controversy exceeds $25,000.00.

17.     Plaintiffs, Kenneth L. Haynes and Darenda A. Haynes are victims of the RYM Tech equity-stripping mortgage fraud scheme that has spread throughout the United States.

18.     Under the scheme, First Franklin made a loan for $117,900.00 on property that was worth only $77,000.00.

19.     The Defendants used fraudulent appraisals in order to make the loan look legitimate.

20.     All of the Defendants knew, or should have known, that the appraisals were fraudulent and there was mortgage fraud taking place.

21.     Under the scheme, Defendants converted over $70,000.00 of the proceeds of the loan that were supposed to go to the Plaintiffs.

22.     Under the scheme RYM Tech and the Defendants promised the Plaintiffs that their home would be paid off within five years and that under no circumstances would they lose their home to foreclosure.

23.     Under the scheme the Plaintiffs were induced to sign a "Lease" (**Exhibit A**) under which they would receive their property back free and clear for the sum of $10.00 at the end of five years.

3

24.     Under the scheme the Plaintiffs would make payments to RYM Tech and RYM Tech would pay off the mortgage to First Franklin.

25.     First Franklin did the financing for a number of these fraudulent loans and was involved in the scheme.

26.     RYM Tech and the other Defendants took the Plaintiffs' $70,000.00 as well as other payments that the Plaintiffs were making to RYM Tech pursuant to the agreement and then RYM Tech stopped making payments on the mortgage.

27.     First Franklin assigned the Mortgage to National City and National City foreclosed on the property.

28.     Defendants, First Franklin and National City knew or should have known that the property was not worth $117,000.00 and that there was mortgage fraud taking place with this loan.

29.     Seven to ten organizational meetings for the RYM Tech criminal enterprise were held at Fifth Third Bank and Royal Mortgage, Inc. was actively involved in the fraudulent scheme.

30.     Plaintiffs, as well as the others who attended these meetings, were convinced that the enterprise must be legitimate since it was associated with Fifth Third Bank and used Fifth Third Bank's offices for its organizational meetings and seminars.

31.     Defendant, Land Owners Title Agency, did all of the title work for the closings on the equity stripping loans and was intimately involved in the fraud.

32.     Defendant, Source One Mortgage Company, was the mortgage originator for the equity stripping loans and was intimately involved in the fraud and arranged for the fraudulent appraisals.

4

33. Defendants, Felix L. Daniel, Sr., Anthony B. Fields, Derrick A. Beeler and Ray Fluker were officers of RYM Tech and were intimately involved in inducing the Plaintiffs to become victims of the fraudulent scheme.

34. Defendants, Felix L. Daniel, Sr., Anthony B. Fields, Derrick A. Beeler and Ray Fluker constantly assured the Plaintiffs that their home would never be foreclosed upon and their mortgage would be paid off within five years.

35. Fifth Third Bank was an important part of the mortgage fraud since it offered its offices to RYM Tech which gave the appearance of legitimacy to the enterprise.

36. The United States mail was used throughout the fraudulent transaction.

37. The property at issue in this matter is located at 20015 Woodbine Street, in the City of Detroit and had a legal description as follows:

Lot 1202, Holtzman and Silverman Subdivision No. 7, as Recorded in Liber 78, Pages 25 and 26, of Plats, Wayne County Records, Commonly known as 20015 Woodbine, Detroit, Michigan 48219

38. At the organizational meetings for the enterprise victims such as the Plaintiffs were wined and dined at the Fifth Third Bank facility.

39. National City bid in $77,865.05 at the foreclosure sale on property that was represented to be worth $135,000.00. (Exhibit B)

40. All of the Defendants knew or should have known that this case was a classic case of equity stripping fraud since the appraisals were obviously inflated and RYM Tech was involved.

41. Defendant, Lynn E. Cargill and Timothy G. Wegmeyer were attorneys who consistently represented to the Plaintiffs that the deal was legitimate and the Plaintiffs relied on their legal advice to their detriment.

42.  The Plaintiffs have lost the equity in their home.

43.  Under the scheme, the Plaintiffs were induced to deed their home to Defendants, Wayne Smith and Ardrena Smith pursuant to the agreement that the property would be deeded back to them at the end of five years. **(Exhibit C)**

44.  Defendants, Wayne Smith and Ardrena Smith were part of the fraudulent scheme and were known as "A buyers" who fraudulently obtained a loan from First Franklin by making a number of material misrepresentations to First Franklin.

45.  None of the Defendants were bona fide purchasers entitled to the protection of the Michigan Recording Act since they were on inquiry notice that at all times that Plaintiffs were in possession of the property and were the true owners of the property.

46.  Upon information and belief, the Defendants forged the Plaintiffs' signature on a check in the amount of $70,000.00 that was payable to the Plaintiffs as a result of the sale of their home.

## COUNT I.
## R.I.C.O. VIOLATION

47.  Plaintiffs incorporate all allegations contained in this Complaint into Count I.

48.  The conduct of the Defendants in this case amounts to a violation of the Racketeer Influenced and Corrupt Organizations Act, 18 USC § 1961 et. seq.

49.  The Defendants have engaged in a pattern of racketeering in an ongoing criminal enterprise in violation of the provisions of 18 USC § 1961 et. seq.

50.  The racketeering engaged in by the Defendants includes mail fraud, financial institutions fraud, securities fraud, theft, embezzlement and general fraud.

51. The Defendants have used their equity-stripping scheme on hundreds of innocent individuals throughout the United States.

52. Fifth Third Bank used its offices to lend legitimacy to the racketeering enterprise.

53. Royal Mortgage was instrumental in convincing people such as the Plaintiff to invest their life savings in the RYM Tech scheme.

54. The Defendants were engaged in the enterprise for a similar purpose which was to steal the equity that individuals had built up in their homes.

55. Under R.I.C.O. the Plaintiffs are entitled to attorney fees and treble damages.

56. Plaintiffs have lost the equity in their home, plus $70,000.00 which was supposed to be transferred to them by the Defendants.

WHEREFORE, Plaintiffs respectfully requests that this Honorable Court enter Judgment in their favor for whatever they are found to be entitled, that the damage amount be trebled, and that the Plaintiffs be awarded all costs, attorney fees, and any other damages allowable under the R.I.C.O. Act.

## COUNT II.
## FRAUD

57. Plaintiffs incorporate all of the allegations contained in this Complaint into Count II.

58. The Defendants made numerous representations to the Plaintiffs in order to induce them to enter into a Mortgage and Lease Agreement.

59. Defendants at all times promised the Plaintiffs that they would not lose the equity in their home and that their mortgage would be paid off in five years.

7

60.     Defendants made a number of other representations, including representations regarding the value of the Plaintiffs home which was placed at $131,000.00 when the actual value of their home is $77,000.00 at most.

61.     The representations made by the Defendants were false.

62.     The misrepresentations made the Defendants were material.

63.     Plaintiffs relied on the material misrepresentations of the Defendants with the result that they lost the equity in their home and the $70,000.00 proceeds of the "sale".

64.     The actions of the Defendants amount to fraud under Michigan law.

WHEREFORE, Plaintiffs respectfully prays that this Honorable Court enter Judgment in their favor in whatever amount they are found to be entitled plus costs, interest and attorney fees. Plaintiffs also pray that the Sheriff's Deed on their property be cancelled and that title be quieted in their name in fee simple absolute.

## COUNT III
## VIOLATION OF THE CONSUMER PROECTION ACT

65.     Plaintiffs incorporate all of the allegations contained in this Complaint into Count III.

66.     The conduct of the Defendants in this case amounts to a violation of the Consumer Protection Act, MCL §445.901 et. seq.

67.     Defendants have engaged in a number of unfair, unconscionable and deceptive methods, acts and practices in the conduct of trade or commerce which are unlawful and are defined in Section (c)(n)(o)(s)(x)(bb) and (cc) of MCL §445.903.

68.     As a result of the Defendants' violations of the Consumer Protection Act, the Plaintiffs have suffered substantial damages including the loss of their home.

8

69.    Under §445.911 Plaintiffs are entitled to have the Defendants pay their reasonable attorney fees.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter Judgment in their favor for whatever amount they are found to be entitled, plus all costs, attorney fees and any other damages allowable under the law.

## COUNT IV.
## CANCELLATION OF MORTGAGE AND SHERIFF'S DEED

70.    Plaintiffs incorporate all of the allegations contained in this Complaint into Count IV.

71.    All of the Defendants had actual notice or at a minimum, constructive notice of the fraud involved in this matter.

72.    None of the Defendants were bona fide purchasers for value for purposes of the Michigan Recording Act.

73.    The inflated mortgage amount based on the fraudulent appraisals was a badge of fraud which gave the Defendants actual knowledge or at least constructive knowledge of the mortgage fraud.

74.    All of the Defendants had a duty to make a reasonable inquiry regarding Plaintiffs' possession of the property and the status of the mortgages and appraisals.

75.    The Defendants used fraud to influence the Plaintiffs into signing the Deed to Wayne and Ardrena Smith (**Exhibit C**) and the Lease with RYM Technology (**Exhibit A**).

76.    All of the Defendants were aware or should have been aware that the First Franklin loan was fraudulent and that the loan was part of a fraudulent equity stripping scheme.

77.   Due to the fraud involved in this transaction, the Note and Mortgage issued to First Franklin (**Exhibit D**) and transferred to National City (**Exhibit E**) are void and of no effect.

78.   The Court, as a Court of equity should set aside and hold for naught the Note, Mortgage, and Sheriff's Deed (**Exhibit B**) since those documents are void under Michigan law.

WHEREFORE, Plaintiffs pray for the following relief:

A.   That this Honorable Court hold the Note and Mortgage issued to First Franklin are set aside and held for naught.

B.   That the Court hold that the Sheriff's Deed (**Exhibit B**) is set aside and held for naught.

C.   That the Court quiet title in Plaintiffs, Kenneth L. Haynes and Darenda A. Haynes.

D.   That the Court grant such other and further relief as shall be appropriate under the circumstances.

## COUNT V.
## BREACH OF CONTRACT

79.   Plaintiffs incorporate all of the allegations contained in this Complaint into Count VI.

80.   Defendants promised Plaintiffs on a number of occasions that they would not lose the equity in their home and their home would not foreclosed upon.

81.   Defendants told Plaintiffs that if they made payments to RYM Tech, then RYM Tech would pay off their mortgage within five years and at the end of that period they would receive title to their home free and clear of any mortgage.

82.    Plaintiffs relied on the above promises in entering into the RYM Tech Agreement and the mortgages.

83.    The promises as detailed above and throughout this Complaint were false.

84.    As a result of the Defendants' failed promises, they are in breach of contract.

85.    As a result of the Defendants' breach of contract, the Plaintiffs have suffered damages, including the loss of the equity in their home and $70,000.00 which was converted from them at the time of the transfer of their home.

WHEREFORE, Plaintiffs pray for a Judgment against the Defendants in whatever amount they are found to be entitled, plus costs, interest and attorney fees.

HAFELI STARAN HALLAHAN
CHRIST & DUDEK, P.C.

MARK W. HAFELI (P28908)
Attorneys for Plaintiffs
4190 Telegraph Road, Suite 3000
Bloomfield Hills, MI 48302-2082
(248) 731-3083

Dated: December 7, 2007

11

# EXHIBIT A



# RESIDENTIAL LEASE AND TRUST AGREEMENT

THIS INDENTURE OF LEASE AND TRUST (hereinafter referred to as the "Lease and Trust Agreement") is made this 27 th day of April, 2004, by and between RYM Technology, a Michigan limited liability company, with offices located at 330 East Maple Rd. #408, Birmingham, Michigan, 48009, (hereinafter referred to as the "Landlord") and Kenneth L. & Darenda A. Haynes, a Couple residing at 20015 Woodbine, Detroit, Michigan, 48219, (hereinafter referred to as the "Tenant").

## WITNESSETH

Whereas, the Tenant is the owner of that certain property located in the City of Detroit, as more particularly described in Exhibit A, attached hereto and made a part hereof by this reference, with a commonly known address of 20015 Woodbine (hereinafter referred to as the "Premises"); and

Whereas, pursuant to the terms and conditions of that certain real estate purchase agreement of even date herewith, Tenant has agreed to convey to the Landlord the Premises, for and in consideration of the Landlord's agreement to lease the Premises back to the Tenant for a term of years, and in consideration of Landlord satisfying all obligations of the Tenant heretofore secured by a mortgage on the Premises and for certain other services to be provided by the Landlord in accordance with the terms, conditions and covenants as hereinafter set forth; and

NOW, THEREFORE, in consideration of the premises, the mutual understandings and agreements by and between the Landlord and the Tenant, the parties hereto covenant and agree as follows:

1.    **LEASE.**    Landlord hereby leases to Tenant and Tenant hereby hires from Landlord the Premises described in Exhibit A hereto, containing _____, square feet of space, including the (attached – detached) garage and certain other improvements as described in Exhibit A for Tenant's use and occupancy as its personal and primary residence.

2.    **LEASE TERM.** This Lease and Trust Agreement shall be for a term of five (5) years, commencing on April 27, 2004, (the "Commencement Date"), and ending on April 27, 2009.

3.    **RENT.** Tenant shall pay to Landlord rent, at such place as Landlord may designate, in accordance with the following schedule:

| Months | Monthly Rent |
|--------|--------------|
| 1-6 | -0- |
| 7-60 | $674.95 |

Rent shall be due on the first day of each month during the term of this Lease and Trust Agreement. If Tenant fails to pay any amount due to Landlord under this Lease and Trust Agreement when that amount is due, the Tenant shall pay a late charge of $26.62, in addition to the rent. All rental payments or such other sums to be due and payable to the Landlord shall be made at such place as the Landlord shall designate in writing from time to time.

4. **SECURITY DEPOSIT**. No security deposit shall be required of the Tenant under this Lease and Trust Agreement.

5. **INVENTORY**. Tenant hereby acknowledges receipt of two (2) blank copies of a commencement inventory checklist, which sets forth all items and improvements on the Premises owned by the Landlord. Tenant shall review the checklist, note the condition of the personal property and improvements and return one (1) copy of the checklist to the Landlord within seven (7) days after the Commencement Date of this Lease and Trust Agreement. Upon termination of this Lease and Trust Agreement, Landlord shall complete a termination inventory checklist, listing all damages, if any, to Landlord's property caused by Tenant. Within thirty (30) days after termination of the Lease and Trust Agreement, if Tenant does not purchase the Premises in accordance with Article 18 hereof, Landlord shall submit to Tenant an itemized list of all damages claimed, including the cost to repair or replace such property, and Tenant shall tender to Landlord the amount so claimed within ten (10) days after receipt of same.

6. **OCCUPANCY AND POSSESSION**. The Premises, and any part thereof, shall be used and occupied by the Tenant only, strictly as a private dwelling, primary residence, and for no other purpose, and shall not, without the prior written consent of the Landlord, be occupied by any persons other than the Tenant and the minor dependents of the Tenant, if any. Tenant shall not intentionally and knowingly use the Premises for any purpose or in any manner in violation of any law, ordinance, rule or regulation adopted or imposed by any federal, state, county or municipal body or other governmental agency.

7. **USE AND CARE OF PREMISES BY TENANT**. The Premises, or any part thereof, shall not be used or occupied for a boarding or lodging house, nor for rooming or school purposes, nor to give instruction in music or vocal or physical training, nor for any trade, business or entertainment, nor for any purpose or any activity in or about the Premises that will result in an increase of any insurance premium on the Premises. Tenant shall not deface or injure the Premises, permit anything to be done on the Premises tending to create a nuisance or disturb the surrounding area, or keep or allow there to be kept on or used in or around the Premises or in immoral practice, nor any act or any practice that will injure the reputation of the Premises or the buildings or of the neighborhood shall be permitted or committed therein, nor shall Tenant cause or permit the display of any sign or advertising matter upon or about the Premises without in each case the consent in writing of the Landlord. No services of a religious nature or a funeral shall be held on the Premises.

Tenant acknowledges that it has received the Premises in good order and repair, except as to those matters specifically identified by Tenant on the commencement inventory

F-2400.04
02/25/04

checklist described in Article 5 hereof, and that upon the termination of this Lease and Trust Agreement, whether voluntary or involuntary, Tenant shall relinquish any right, title, interest or claim in and to the Premises, the stove, range, refrigerator and any and all other appliances or fixtures, and turn same over to Landlord in as good condition as upon the effective date of this Lease and Trust Agreement, ordinary wear and tear resulting from the careful usage and damage by the elements without fault on the part of the Tenant, excepted. Tenant further covenants to maintain and keep the Premises in good condition and repair, including, but not limited to, defrosting mechanical refrigerator as necessary, keeping traverse rods and shades, inside woodwork and windows clean and presentable at all times and keeping the flooring and linoleum installed on the Premises properly waxed at all times, and all carpeted areas within the Premises clean and vacuumed at least once per week.

8.    **ASSIGNMENT AND SUBLETTING.** Tenant agrees not to sell, assign, mortgage, pledge, or in any manner transfer this Lease and Trust Agreement or sublet the Premises or any part thereof.

9.    **CERTAIN RIGHTS RESERVED BY LANDLORD.** The Landlord reserve to right to have free access at all reasonable hours to the Premises for the purpose of making repairs, protecting the Premises against fire, preventing damage or injury to the Premises and for the purpose of inspecting the same; provided, however, that the Tenant shall be liable for any and all costs or expenses incurred by Landlord arising out to the negligence of the Tenant.

10.    **HOLDING OVER.** It is agreed that unless Tenant gives written notice of his intention to vacate the Premises thirty (30) days prior to the expiration of this Lease and Trust Agreement, and Tenant remains in possession of the Premises after the expiration or termination of this Lease and Trust Agreement, or if the Tenant has committed a default hereunder and has not purchased the Premises in accordance with Article 18 hereof, Tenant shall be deemed to be occupying the Premises as a tenant from month to month, at the rate established for rent in month 60 of this Lease and Trust Agreement, subject to all the conditions, provisions, and obligations of this agreement insofar as it can be applicable to a month to month tenancy, cancelable by either party upon seven (7) days written notice to the other. The Landlord shall also have all remedies available to it at law and equity upon the expiration or termination of this Lease and Trust Agreement.

11.    **TAXES AND INSURANCE.** The Landlord shall be obligated to pay all property taxes and special assessments levied against the Premises and the lands and improvements associated therewith. The Tenant shall pay all personal property taxes assessed against any personal property owned by Tenant on the Premises.

The Landlord shall insure the Premises, including the building and improvements and the land on which they are situate, against loss or damage under a policy of fire or extended coverage insurance in amounts the Landlord deems appropriate.

Tenant shall comply in all respects with any policy of insurance now upon or covering the Premises, or which may hereafter be secured with respect to same. Tenant agrees the he will not permit anything to be done on or about the Premises or the improvements associated therewith which could have the result of voiding any hazard or other insurance or increase the rate of insurance thereon or upon the personal property kept on the Premises.

Tenant shall indemnify Landlord and keep Landlord harmless from any liability or claim for damages that may be asserted against Landlord because of any accident or casualty occurring

F-2400.04

on or about the Premises as a result of the Tenant's negligence, or the negligence, misfeasance or malfeasance of Tenant's family members, agents, visitors or licensees. Tenant shall, at its sole cost and expense, obtain and keep in force a policy or policies of insurance classified as renter's insurance, insuring Tenant's personal property kept at the Premises. Tenant agrees that any personal property kept at the Premises is stored there at Tenant's sole risk.

12. **VEHICLES AND MECHANICS WORK.** Automobile and maintenance work performed in or about the Premises or the grounds associated therewith, shall not be permitted or allowed, and the commission or permission of same shall be considered a material breach of this Lease and Trust Agreement. Tenant also agrees that he will not store inoperative automobiles or trucks, boats or trailers in or about the Premises or the grounds associated therewith or in the parking areas related to the Premises, without the prior written consent of Landlord. The vehicles described in this Article 12 shall include, but not be limited to, Tenant's vehicles, vehicles of Tenant's family members lawfully occupying the Premises, or the vehicles of any agents, visitors or licensees of the Tenant.

13. **RULES AND REGULATIONS.** Tenant and Tenant's family members, agents, visitors and licensees shall faithfully observe and strictly comply with the following rules and regulations:

a. Tenant shall not alter any lock or install any new lock or knocker or other attachment to any door of the Premises without the prior written consent of the Landlord. Tenant shall not cause any keys to be made for locks on doors within the Premises.

b. Tenant shall not permit or do anything in or about the Premises that will disturb, annoy or interfere with the rights, comforts or conveniences of other surrounding neighbors or business establishments.

c. No alterations, additions, painting or decorating may be done to the Premises without the prior written consent of the landlord. Such work shall be done at such times and in such manner as Landlord may direct and designate. Tenant shall be responsible for any and all cost associated with any such alterations, additions, improvements or decorating authorized upon the Landlord. Any such alterations, additions, painting or decoration upon the Premises, made by either the Landlord or the Tenant shall become the property of the Landlord and be surrendered with the Premises upon the termination or expiration of this Lease and Trust Agreement; provided Tenant does not exercise his right to purchase the Premises pursuant to Article 18 hereof, upon the expiration of this Lease and Trust Agreement and provided there are no uncured defaults hereunder.

d. Tenant shall not, without the prior written consent of the Landlord, perform any painting or decorating or make any alterations or additions to the Premises. Tenant shall not drive any nails or screws or their equivalent into the wall, ceiling, woodwork or floors of the Premises, or make any change in the internal structure of the Premises or any building associated therewith or any room therein. Only "s" type bulldog hooks are permitted on the walls or woodwork of the Premises. Further, all alterations, additions, painting and decorating, whether temporary or permanent in character, made by the Landlord or Tenant in or upon the Premises shall, unless Landlord requests

their removal, become property of the Landlord and shall remain upon the Premises at the termination or expiration of this Lease and Trust Agreement without any compensation to the Tenant therefore.

c. TENANT AGREES TO FURNISH, AT HIS SOLE COST AND EXPENSE, ADEQUATE INSURANCE CLASSIFIED AS "RENTER'S INSURANCE" TO PROTECT AGAINST THE LOSS OF TENANT'S PERSONAL PROPERTY.

f. No water beds are permitted on the Premises.

g. TENANT SHALL BE RESPONSIBLE FOR ALL UTILTIES, INCLUDING WATER AND SEWERAGE. Tenant shall have utilities metered in his own name, and shall pay all charges and deposits for the utilities provided to or used in the Premises during the term of this Lease and Trust Agreement. Landlord shall not be liable in damages should the furnishing of any utilities be interrupted by fire or other casualty, accident, strike, labor dispute or disagreement, the making of any necessary repairs or improvements, or any other causes beyond the reasonable control of the Landlord.

h. TENANT MUST NOTIFY LANDLORD IN WRITING WITHIN FOUR (4) DAYS AFTER MOVING OF A FORWARDING ADDRESS WHERE TENANT CAN BE REACHED AND WHERE TENANT WILL RECEIVE MAIL; OTHERWISE LANDLORD SHALL CONSIDER THIS LEASE AND TRUST AGREEMENT ABANDONED AND SHALL HAVE NO FURTHER OBLIGATION TO THE TENANT.

Landlord reserves the right, as it deems necessary, to adopt from time to time additional rules or regulations or to modify or amend the existing rules and regulations set forth herein, to provide for the comfort and convenience of the Tenant and for the safety, care and proper maintenance and cleanliness of the Premises

14. **FIRE AND CASUALTY.**    If during the term of this Lease and Trust Agreement, the Premises are partially or totally destroyed by fire or other casualty covered by insurance, and without the fault or neglect of the Tenant or Tenant's family members, agents, visitors or licensees, so as to become partially or totally untenantable, the Premises shall be repaired as speedily as possible at Landlord's expense unless this Lease and Trust Agreement is terminated as hereinafter provided.    During the pendency of such repairs, the rent shall be apportioned according to the habitable and usable portion of the Premises. No penalty shall accrue against the Landlord for reasonable delay which may arise by reason of adjustment of fire insurance on the part of the Landlord/or Tenant or for reasonable delay on account of "labor troubles", or any other cause beyond the Landlord's control.

If during the term of this Lease and Trust Agreement, the Premises are partially or totally destroyed by fire or other casualty, and the cost of restoring the Premises or any buildings associated therewith to its prior condition equals or exceeds fifty (50%) percent of its fair replacement value immediately before the damage, or if the Premises are damaged by casualty not insured against by the Landlord, the Landlord shall have the right to terminate this Lease and Trust Agreement by giving Tenant written notice of its election to do so within fifteen (15) days after the date on which the damage occurs. Upon the giving of the notice, this Lease and Trust Agreement shall terminate as of the date on which the damage occurred, and the rent shall be

F-2400.04

adjusted to that date. If the notice by Landlord is not given, this Lease and Trust Agreement shall continue and the Landlord shall cause the Premises or the any portion thereof so damaged to be repaired and restored with due diligence.

15.   **REQUIREMENTS OF LAW.**   Tenant shall comply with all laws, orders and regulations of federal, state, county and municipal authorities, which shall impose any duty upon the Landlord or Tenant with respect to the Premises or the use or occupancy thereof; and shall not do or permit to be done any act or thing upon the Premises or the buildings or grounds associated therewith which shall or might subject the Landlord to any liability or responsibility for injury to any person or persons or to any property by reason of any business or operation being carried on or upon the Premises.

16.   **CONDEMNATION.**   If the whole or any part of the Premises is taken by any public authority under the power of eminent domain, including any conveyances or grants made in anticipation of, or in lieu of, such a taking, then the term of this Lease and Trust Agreement shall cease on that part of the Premises to be taken from the day the possession of that part shall be acquired by public authority, and the rent shall be paid up to that date. If the taking of a portion of the Premises substantially impairs the usefulness of the Premises for the purpose for which the Premises were leased, Tenant shall have the right either to terminate this Lease and Trust Agreement or to continue in the possession of the remainder of the Premises under the terms and conditions of this agreement, except that the rent shall be reduced in proportion to the amount of the Premises taken and, in the latter event, the Landlord shall promptly restore the remainder of the Premises to a reasonably tenantable condition. All damages awarded for the taking shall belong to and be the property of the Landlord, whether the damages are awarded as compensation for diminution of value of the leasehold or to the fee of the Premises.

17.   **DEFAULT AND REMEDIES.** Each of the following shall be a default by Tenant hereunder:

a.      Failure of Tenant to pay any rent when due or to pay or caused to be paid any impositions, insurance premiums or other liquidated sums of money herein stipulated to be paid by Tenant, if such failure shall continue for a period of fifteen (15) days after notice thereof has been given by Landlord to Tenant;

b.      Failure by Tenant to perform or observe any of the provisions of this Lease and Trust Agreement, other than the payment of rent as required in Article 3 hereof, stipulated in this agreement to be observed and performed by Tenant, if such failure shall continue for a period of thirty (30) days after notice thereof has been given by Landlord to Tenant; provided, however, that if any such failure cannot be reasonably be cured within such thirty (30) day period, then Landlord shall not have the right to terminate this Lease and Trust Agreement or Tenant's right to possession of the Premises hereunder so long as Tenant promptly commences the curing of such failure and thereafter proceeds in good faith and with due diligence to remedy and correct such failure within a reasonable period of time; provided however, that such period shall not extend for more than ninety (90) days after the date of Landlord's notice to Tenant.

F-2400.04

c.           The subjection of any right or interest of the Tenant in this Lease and Trust Agreement to attachment, execution, or other levy, or to seizure under legal process, if not released within sixty (60) days;

d.           The appointment of a receiver, if such receivership is not terminated, dismissed or vacated within sixty (60) days after the appointment of the receiver;

e.           Tenant shall file a petition for voluntary bankruptcy under the Bankruptcy Code of the United States or any similar law, state or federal, now or hereafter in effect;

f.           Within ninety (90) days after the filing against Tenant of any involuntary proceedings under such Bankruptcy Code or similar law, such proceedings shall not have been vacated or stayed; or

g.           Tenant shall make a general assignment for the benefit of creditors or shall admit in writing his insolvency or inability to pay his debts as they become due or shall consent to the appointment of a receiver or trustee or liquidator of all or the major part of his property, or the Premises.

At any time after the occurrence of a default hereunder, the Landlord may, without limitation or waiver of any rights or remedies it may otherwise have at law or in equity, but subject in all respects to the provisions of this Lease and Trust Agreement with respect Tenant's right to purchase fee title to the Premises pursuant to Article 18 hereof, exercise and one or more of the following rights:

a.           Accelerate the full balance of the rent payable for the remainder of the term and sue for the sums due;

b.           Terminate this Lease and Trust Agreement by giving written notice thereof, setting forth in such notice an effective date for termination which shall not be less than thirty (30) days after the date of such notice, in which event this Lease and Trust Agreement and the estate created hereby and all interest of Tenant and all parties claiming by and through the Tenant, shall automatically terminate upon the effective date for termination set forth in the notice, with the same force and effect and to the same extent as if the effective date of such notice had been the date originally affixed in Article 2 hereof for the expiration of this Lease and Trust Agreement. If suit is brought to recover the possession of the Premises, to recover any rent or any other amount due under the provisions of this Lease and Trust Agreement, or because of the breach of any other covenant to be performed by Tenant, and a default is established, then Tenant shall pay to the Landlord all expenses incurred in the actions, including reasonable attorneys' fees, which shall be deemed to have been incurred on the commencement of the action and shall

be enforceable whether or not the action is prosecuted to judgment; or

c.    Without terminating this Lease and Trust Agreement, re-enter the Premises and dispossess Tenant or any other occupant of the Premises, remove Tenant's effects, and relet the Premises for the account of the Tenant for rent and upon terms that are satisfactory to the Landlord, crediting the proceeds, after deducting the costs and expense of re-entry, alterations, additions, and reletting, to the unpaid rent and other amounts due under this Lease and Trust Agreement during the remainder of the term, and the Tenant shall remain liable to the Landlord for the balance owed.

d.    Landlord shall be in default of this Lease and Trust Agreement if it fails to perform any provision of this agreement that it is obligated to perform or if any of the Landlord's representations and warranties are untrue or become untrue in any material respect, and if the failure to perform or the failure of such representation or warranty is not cured within thirty (30) days after written notice of the default has been given to the Landlord by the Tenant. If the default cannot reasonably be cured within thirty (30) days s, the Landlord shall not be in default of this Lease and Trust Agreement if Landlord commences to cure the default within such thirty (30) day period and diligently and in good faith continues to cure the failure until completion.

If the Landlord shall have failed to cure a default after expiration of the applicable time for cure, the Tenant, at its election, but without obligation therefore, may (i) seek specific performance of any obligation of the Landlord, after which the Tenant shall retain, and may exercise and enforce, any and all right that Tenant may have against the Landlord as a result of such default; (ii) from time to time without releasing the Landlord in whole or in part from the obligations to be performed hereunder, may cure the default at Tenant's sole cost, (iii) exercise any other remedy given hereunder or now or hereafter existing at law or in equity. Any reasonable cost incurred by Tenant in order to cure such default by the Landlord shall be due immediately from the Landlord, and may be offset against any amounts due from Tenant to Landlord. THE TENANT AGREES THAT IT SHALL NOT HAVE THE RIGHT TO ACCELERATE ITS PURCHASE OF THE PREMISES PURSUANT TO ARTICLE 18 HEREOF, WITHOUT INCURRING THE PREPAYMENT PENALTY DESCRIBED THEREIN.

18.    <u>REAL ESTATE INVESTMENT TRUST.</u>    Tenant acknowledges that in an effort to induce the Landlord to enter into this Lease and Trust Agreement, Tenant conveyed its title to the Premises into a Real Estate Investment Trust of which the Landlord is the managing director. Tenant further acknowledges that in consideration for the rent schedule set forth in Article 3 of this Lease and Trust Agreement, and the other obligations of the Landlord hereunder, the Landlord shall have the right to mortgage the Premises and use the proceeds of such financing as the Landlord deems appropriate, so long as any such mortgage against the Premises securing a note from the Landlord shall be fully satisfied and discharged prior to or simultaneous with the expiration of the term of this agreement; provided, however, that this Lease and Trust Agreement is not earlier terminated by the Landlord because of an uncured default by the Tenant, in which case the Landlord shall consider the original ending date of the lease term as the date upon which any and all mortgage secured financing shall be paid in full and any lien upon the Premises securing same shall be fully satisfied and discharged.

F-2400.04

Upon the expiration of the term of this Lease and Trust Agreement, and provided no default by the Tenant exists or is continuing, Landlord shall cause the Real Estate Investment Trust to convey title to the Premises to the Tenant by warranty deed for the sum of Ten and 00/100 ($10.00) Dollars. Tenant may, in his sole discretion, and at his sole cost and expense obtain an owner's commitment or policy of title insurance showing good title in fee to the Tenant upon the conveyance described in this paragraph.

If prior to the end of the term of this Lease and Trust Agreement, the Tenant has committed a default, which is uncured and for which the time to cure has elapsed, and the Landlord exercised its rights and remedies as set forth in Article 17 above, the Tenant shall continue to be entitled to purchase the Premises from the Real Estate Investment Trust as provided in this Article 18, however, Tenant may not and shall not exercise such right until the end of the term of this agreement as if the earlier termination did not occur. In the event, the lease under this Lease and Trust Agreement was terminated due to an uncured default by the Tenant, the Tenant shall, in addition to the Ten and 00/100 ($10.00) Dollars for conveyance of title to the Premises, also be required to pay to the Landlord the total of any and all damages, losses, costs, expenses, claims, and demands incurred by the Landlord as a result of the earlier termination of this agreement.

If the Landlord has committed a default under this Lease and Trust Agreement, which is uncured and for which the time to cure has elapsed, the Tenant shall not be entitled to accelerate its right to purchase the Premises hereunder without paying off the entire indebtedness secured by any mortgage on the Premises (the "Prepayment Penalty"), whether or not same was obtained by the Landlord, and the Landlord shall have no obligation to convey title to the Premises hereunder unless and until the Tenant provides the Landlord with satisfactory evidence, in the Landlord's sole discretion, of its ability to discharge any and all such indebtedness. Otherwise, the Tenant shall have those rights set forth in Article 17 hereof.

19.   **CAPTIONS.**  The captions are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of this Lease and Trust Agreement nor the intent of any provision hereof.

20.   **ENTIRE AGREEMENT.**  This Lease and Trust Agreement supersedes all prior discussions and agreements between the parties with respect to the Premises. This Lease and Trust Agreement contains the sole and entire understanding between the parties with respect to the leasing of the Premises pursuant to this agreement, and all promises, inducements, offers, solicitations, agreements, representations, warranties heretofore made between the parties, if any, are merged into this Lease and Trust Agreement. This Lease and Trust Agreement shall not be modified or amended in any respect, except by written instrument specifically referencing such a modification or amendment which is executed by or on behalf of the parties in the same manner as this Lease and Trust Agreement, and to which the Landlord has consented in writing.

21.   **GOVERNING LAW.**  This Lease and Trust Agreement, and the rights and obligations of the parties hereunder, shall be governed by and construed in accordance with the substantive laws of the State of Michigan.

22.   **BINDING EFFECT.**  This Lease and Trust Agreement shall inure to the benefit of and be binding upon the parties hereto, their heirs, successors, administrators, executors, and permitted assigns.

F-2400.04

23. **SEVERABILITY.** In the event any provision or portion of this Lease and Trust Agreement is held by any court of competent jurisdiction to be invalid or unenforceable, such holdings shall not affect the remainder hereof, and the remaining provisions shall continue in full force and effect to the same extent as would have been the case had such invalid or unenforceable provision or portion never been a part hereof, except to the extent the rights and obligations of the parties have been materially altered by such unenforceability.

24. **GENDER.** Words of any gender used in this Lease and Trust Agreement shall be held and construed to include any other gender, and words of a singular number shall be held to include the plural and the singular, unless the context requires otherwise.

25. **EXHIBITS.** Each and every exhibit referred to or otherwise mentioned in this Lease and Trust Agreement is attached to this agreement and is and shall be construed to be made a part of this Lease and Trust Agreement by such reference or other mention at each point at which such reference or other mention occurs, in the same manner ad with the same effect as if each exhibit were set forth in full at length every time it is referred to and otherwise mentioned.

26. **REFERENCES.** All references to paragraphs or subparagraphs or articles shall be deemed to refer to the appropriate paragraph, subparagraph or article of this Lease and Trust Agreement. Unless otherwise specified in this Lease and Trust Agreement, the terms, "herein," "hereof," "hereinafter," "hereunder," "and other terms of like or similar import, shall be deemed to refer to this Lease and Trust Agreement as a whole, and not any particular paragraph or subparagraph hereof.

27. **RIGHTS CUMULATIVE.** Except as expressly limited by the terms of this Lease and Trust Agreement, all rights, powers, and privileges conferred hereunder shall be cumulative and not restrictive of those provided at law or in equity.

28. **NOTICES.** All notices, requests, demands, or other communications required or permitted to be given hereunder shall be in writing and shall be addressed and delivered by hand or by certified mail, return receipt requested, recognized national overnight delivery service, or by hand delivery by a recognized, reputable courier, to each party at the addresses set forth below. Any such notice, request, demand or other communication shall be considered given or delivered, as the case may be, on the date of receipt. Rejection or other refusal to accept or inability to deliver because of changed address of which proper notice was not given shall not be deemed to be receipt of notice, request, demand or other communication. By giving prior written notice thereof, any party, from time to time, may change its address for notices hereunder.

F-2400.04

If to Landlord:

RYM Technologies Holdings LLC
330 East Maple Rd. #408
Birmingham, Michigan 48009

Attention:  Property Management Department

With a copy to:

Teresa N. Gueyser
Law Office of Teresa N. Gueyser
8109 East Jefferson Avenue, Second Floor
Detroit, Michigan  48214

If to Tenant:
Kenneth & Darenda Haynes
20015 Woodbine
Detroit, Michigan 48219

With a copy to:

Teresa N. Gueyser
Law Office of Teresa N. Gueyser
8109 East Jefferson Avenue, Second Floor
Detroit, Michigan  48214

29.    TRUTH IN RENTING ACT (MCL 554.631 TO 554.641).     The     Landlord
and Tenant specifically agree that this Lease and Trust Agreement shall not, is not intended, nor
shall it be construed, to violate any of the provisions of the Truth in Renting Act.  If, however,
any provision of this Lease and Trust Agreement is determined by a court of competent
jurisdiction to violate such statute, then such provision shall be null and void without affecting the
enforceability of the remaining provisions of this Lease and Trust Agreement and same shall
continue in full force and effect.

30.    SUBORDINATION OF MORTGAGE. Any mortgage now or later placed upon
the property of which the Premises are a part shall be deemed to be prior in time and senior to the
rights of the Tenant under this Lease and Trust Agreement.  The Tenant hereby subordinates all
of its interest in the leasehold estate created by this Lease and Trust Agreement to the lien of any
mortgage of the Landlord.   The Tenant shall, at Landlord's request, sign any additional
documents necessary to indicate this subordination.

Notwithstanding the foregoing, Tenant's possession of the Premises under this
Lease and Trust Agreement shall not be disturbed by any mortgage, trustee under a trust deed,
owner, or holder of a note secured by a mortgage or trust deed now existing or later placed on the
Premises, unless Tenant commits a default or breaches any of the provisions of this Lease and
Trust Agreement and the term hereof of Tenant's right to possession is lawfully terminated in
accordance with the provisions of this agreement.

F-2400.04

31.   **ESTOPPLE AGREEMENT**.   At the request of the Landlord, Tenant shall, within five (5) days, deliver to the Landlord, or anyone designated by the Landlord, a certificate stating the commencement date and the term of this Lease and Trust Agreement, and certifying, as of that date, the date to which rent, and other charges, if any, are paid, that the Lease and Trust Agreement is unmodified and in full force, and that the Landlord is not in default under any provision of the Lease and Trust Agreement, or if the Lease and Trust Agreement is modified or if the Landlord is in default the modification or the nature of the default and the amount of any claims.

Tenant hereby acknowledges that he has read this entire Lease and Trust Agreement consisting of 12 pages, 31 articles, and 0 exhibits, and by his signature below, agrees to and will be bound by the terms hereof.

NOTICE:  MICHIGAN LAW ESTABLISHES RIGHTS AND OBLIGATIONS FOR PARTIES TO RENTAL AGREEMENTS.   THIS AGREEMENT IS REQUIRED TO COMPLY WITH THE TRUTH IN RENTING ACT.  IF YOU HAVE A QUESTION ABOUT THIS INTERPRETATION OF THE PROVISIONS OF THIS AGREEMENT, YOU MAY WANT TO SEEK ASSISTANCE FROM AN ATTORNEY OR OTHER QUALIFIED PERSON.

IN WITNESS WHEREOF, the parties hereto have executed this Lease and Trust Agreement as of the day and year first above written.

WITNESSES:

_____

_____

RYM TECHNOLOGY HOLDINGS, LLC:

By: _____

Its: _____

TENANT(s):

_____
Kenneth L. Haynes

_____
Darenda A. Haynes

# EXHIBIT B

Case 2:08-cv-10358-LPZ-MJH ECF No. 1, PageID.52 Filed 01/24/08 Page 32 of 50

Branch :ATY,User :9E83         Comment:         Station Id :EZES

10007570

OCT 3 1 2006

FILE DO NOT MAIL

185.00 TRANSFER TAX COUNTY
Receipt #160233
RECORDED
BERNARD J. YOUNGBLOOD, REGISTER OF DEED
WAYNE COUNTY, MI

$25.00 HANDLING FEES

$6.00 REMONUMENTATION

*27.00 DEED

## SHERIFF'S DEED ON MORTGAGE SALE

     This Indenture made the 19th day of October A.D. 2006, between _____ Sterling Harrison _____, a Deputy Sheriff in and for WAYNE County, Michigan, party of the first part, and NATIONAL CITY BANK c/o NATIONAL CITY HOME LOAN SERVICES, INC., 150 ALLEGHENY CENTER, PITTSBURGH, PA 15212, party of the second part (hereinafter called the grantee).

     WITNESSETH, That Whereas WAYNE SMITH AND ARDRENA SMITH, HUSBAND AND WIFE made a certain mortgage to FIRST FRANKLIN FINANCIAL CORP., SUBSIDIARY OF NATIONAL CITY BANK OF INDIANA (hereinafter called the mortgagee), which was duly recorded in the Office of the Register of Deeds in and for said WAYNE County , in Liber 40596, on page 2500 of WAYNE County Records, and was assigned by said mortgagee to the NATIONAL CITY BANK as assignee,

     WHEREAS, said mortgage contained a power of sale which has become operative by reason of a default in a condition of said mortgage, and

     WHEREAS, no suit or proceeding at law or in equity have been instituted to recover the debt secured by said mortgage or any part thereof, and

     WHEREAS, by virtue of said power of sale, and pursuant to the statute of the State of Michigan in such case made and provided, a notice was duly published and a copy thereof was duly posted in a conspicuous place upon the premises described in said mortgage that the said premises, or some part of them, would be sold on the October 19, 2006 at Jefferson Avenue entrance to the Coleman A. Young Municipal Center in Detroit, MI that being the place of holding the Circuit Court for WAYNE where the premises are situated and

     WHEREAS, pursuant to said notice I did, at 01:00 PM, on the aforesaid, expose for sale at public venue the said lands and tenements hereinafter described, and on such sale did strike off and sell the said lands and tenements to the grantee for the sum of seventy seven thousand eight hundred sixty five and 05/100 ($77,865.05), that being the highest bid therefore and the grantee being the highest bidder, and

     WHEREAS, said lands and tenements are situated in the CITY OF DETROIT, WAYNE, Michigan, more particularly described as follows:

     LOT 1202, HOLTZMAN AND SILVERMAN SUBDIVISION NO. 7, AS RECORDED IN LIBER 78, PAGES 25 AND 26, OF PLATS, WAYNE COUNTY RECORDS
     Tax Parcel # 22-122895025

     Current Mortgagor Address: P.O. BOX 190, SOUTHFIELD, MI 48037    aka 20015 Woodbine

This document exempt as to state transfer tax
by virtue of 207.526(6)(a).


STATE OF MICHIGAN
WAYNE COUNTY
NOVEMBER 8, 2006
RECEIPT #160233

REAL ESTATE
TRANSFER TAX
$    85.80-CO-
$    0.80-ST
STAMP #108814227

104263319 / SMITH
Sheriff's Deed – Non-Abandonment 4/20/05

R Shd 27 6L TRES ECWS(K)SEB 25.00

WAYNE,MI
Document: DD SH 45540.347        Page 1 of 7         on 6/5/2007 10:46:34 AM

Branch :ATY,User :9E83

Comment:

Station Id :EZBS

LI-45540      Pg-348

NOW, this Indenture Witnesseth, That I _____ Sterling Harrison _____, the Deputy Sheriff aforesaid, by virtue of and pursuant to the statute in such case made and provided, and in consideration of the sum of money so paid as aforesaid, have granted, conveyed, bargained and sold, and by this deed do grant, convey, bargain and sell unto the grantee, its successors and assigns, forever, all the estate, right, title and interest which the said Mortgagor .... had in said land and tenements and every part thereof, on the April 27, 2004, that being the date of said mortgage, or at any time thereafter, to have and to hold the said lands and tenements and every part thereof to the said grantee, its successors and assigns forever, to their sole and only use, benefit and behoof forever, as fully and absolutely as I, the Deputy Sheriff aforesaid, under the authority aforesaid, might, could or ought to sell the same.

IN WITNESS WHEREOF, I have hereunto set my hand and seal, the date and year first above written.

_____ Sterling Harrison
Deputy Sheriff in and for the County of WAYNE

Signed, Sealed and Delivered in the Presence of

_____

_____

STATE OF MICHIGAN
COUNTY OF WAYNE      ss.

On this 19th day of October A.D. 2006 before me, a Notary Public in and for said County of WAYNE came
Sterling Harrison _____ a Deputy Sheriff of said County, known to me to be the individual described in and who executed the above conveyance, and who acknowledged that he executed the same to be his free act and deed as such Deputy Sheriff.

_____

Notary Signature (Type Name below line)
Notary Public, _____ County, Michigan
My Commission expires:

Terri Sims Hilton
Notary Public State of Michigan
County of Oakland
My Commission Expires 10/26/2011
Acting in the County of Wayne

1044261319 / SMITH
Sheriff's Deed – Non-Abandonment 4/20/05

WAYNE,MI
Document: DD  SH 45540.347

Page 2 of 7

Branch :ATY,User :9E83        Comment:        Station Id :EZES

LI-45540        Pa-349

**EVIDENCE OF SALE**

Tremain WAYNE SMITH

ROBERT A. TREMAIN
& ASSOCIATES, P.C.
401 South Old Woodward Avenue
Suite 300
Birmingham, MI 4800933816
Robert A. Tremain & Associates, P.C. is a debt collector and
we are attempting to collect a debt and any information
obtained will be used for that purpose.
1044393319/SMITH
MORTGAGE SALE - Default has been made in the conditions
of a mortgage made by WAYNE SMITH AND ARDRENA
SMITH, HUSBAND AND WIFE to FIRST FRANKLIN
FINANCIAL CORP., SUBSIDIARY OF NATIONAL CITY BANK
OF INDIANA, Mortgagee, dated April 27, 2004, and recorded
on May 12, 2004, in Liber 40589, on page 2500, in WAYNE
County Records, Michigan, and assigned by said mortgagee to
NATIONAL CITY BANK by an assignment dated March 11,
2005, on which mortgage there is claimed to be due at the date
hereof the sum of one hundred twenty one thousand one
hundred sixty four and 00/100 Dollars ($121,164.00), including
interest at 10.250% per annum WITH AN ADJUSTABLE RATE
RIDER.
Under the power of sale contained in said mortgage and the
statute in such case made and provided, notice is hereby given
that said mortgage will be foreclosed by a sale of the
mortgaged premises, or some part of them, at public vendue, at
the Jefferson Avenue entrance to the Coleman A. Young
Municipal Center in Detroit, MI, at 01:00 PM on October 19,
2006.
Said premises are situated in CITY OF DETROIT, WAYNE
County, Michigan and are described as:
LOT 1202, HOLTZMAN AND SILVERMAN SUBDIVISION NO.
7, AS RECORDED IN LIBER 76, PAGES 25 AND 26, OF
PLATS, WAYNE COUNTY RECORDS
The redemption period shall be 6 months from the date of such
sale, unless determined abandoned in accordance with 1948CL
600.3241a, in which case the redemption period shall be 30
days from the date of such sale.
DATED: September 20, 2006
Robert A. Tremain & Associates, P.C.
401 South Old Woodward Avenue, Suite 300
Birmingham, MI 48009-0816
ATTORNEY FOR NATIONAL CITY BANK Assignee of
Mortgagee
For More Information Call:
(248) 540-7701
(9-20)(10-11)

(Affidavit of Publisher)

STATE OF MICHIGAN
COUNTY OF WAYNE

Resa T. Rodgers being duly sworn, deposes and says the annexed printed
copy of a notice was taken from: Detroit Legal News, a newspaper printed and
circulated in said State and County, and that said notice was published in
said newspaper on: September 20, September 27, October 4, October 11 A.D.,
2006, that she is the agent of the printers of said newspaper, and knows well
the facts stated herein.

Resa T. Rodgers

Subscribed and sworn before me this 16th day of October A.D., 2006

Dawn M. Keith Notary Public Oakland County, Michigan
My commission expires December 18, 2007
Acting in Wayne County, Michigan

(Affidavit of Posting)

STATE OF MICHIGAN

COUNTY OF WAYNE

Wendell Byrd _____ being duly
sworn, deposes and says that on the 22nd day of September A.D.
2006, he posted a notice, a true copy of which is annexed hereto, in a
conspicious place upon the premises described in said notice by attaching the
same in a secure manner to
the front door _____

CIRCLE IF

Multi Unit    Mobile/Manufactured Home    Vacant    No Dwelling

Wendell Byrd

Subscribed and sworn to before me this 25th day of
September A.D. 2006.

Notary Public Wayne County, Michigan
My Commission expires:
Acting in Wayne County Michigan

KEVIN MORRIS
Notary Public, Oakland County, MI
Acting in Wayne County, MI
My Commission Expires May 1, 2010

Branch :ATY,User :9E83                     Comment:                                    Station Id :EZBS

(Affidavit of Auctioneer)
STATE OF MICHIGAN        ss.                        Li-45540        Pa-350
COUNTY OF WAYNE

_Sterling Harrison_

WAYNE County; that (s)he acted as Auctioneer, and made the sale as described in the annexed Deed pursuant to the _____, being duly sworn, deposes and says that (s)he is a Deputy Sheriff of said annexed printed notice: that said sale was opened at 01:00 PM on this 19th day of October A.D. 2006 at the Jefferson Avenue entrance to the Coleman A. Young Municipal Center in Detroit, MI that being the place of holding the Circuit Court in said WAYNE County, and said sale was kept open for the space of one hour; that the highest bid for the land and tenements therein described was the sum of 77,865.05 made by NATIONAL CITY BANK, that said sale was in all respects open and fair; and that (s)he did strike off and sell said lands and tenements to said bidders, which purchased the said lands and tenements fairly, and in good faith, as deponent verily believes.

                                        _Sterling Harrison_
                                        Deputy Sheriff in and for the County of WAYNE

Subscribed and sworn to before me this 19th day of October A.D. 2006.

                                        _Notary Public, WAYNE, Michigan_

                        My Commission expires:      Terri Sims Hilson
                                                    Notary Public State of Michigan,
STATE OF MICHIGAN,          ss.                     County of Oakland
COUNTY OF WAYNE                                     My Commission Expires 10/26/2011
                                                    Acting in the County of Wayne

I DO HEREBY CERTIFY, that the within Sheriff's Deed will become operative on 04/19/2007 unless determined abandoned in accordance with 1948CL 600.3241a, in which case the redemption period shall be 30 days from the date of such sale, unless redeemed according to the law, in such case made and provided.

                                        _Sterling Harrison_
                                        Deputy Sheriff in and for the County of WAYNE

THIS INSTRUMENT DRAFTED BY: Linda J. Jaskiewicz at Robert A. Tremain & Associates, P.C., 401 South Old Woodward Avenue, Suite 300, Birmingham, MI 48009-6616

1044263319 / SMITH
Sheriff's Deed – Non-Abandonment 4/20/05

ORIGINAL

WAYNE,MI
Document: DD SH 45540.347                        Page 4 of 7

                                                    Printed on 6/5/2007 10:46:35 AM

Branch :ATY,User :9E83

Comment:

Station Id :EZES

LI-45540     Pa-351

## NON-MILITARY AFFIDAVIT

State of Michigan     )
                   ) ss.
County of Oakland    )

     The undersigned, being first duly sworn, deposes and says that upon investigation he/she is informed and believes that none of those persons names in the attached notice of mortgage foreclosure, nor any person upon whom they or any of them were dependent, were in the military service of the United States at the time of sale, for six months prior thereto; nor the present grantee(s).

     Deponent further states that this affidavit is made for the purpose of preserving a record and clearing title by virtue of the Soldiers' and Sailors' Civil Relief Act of 1940, as amended.

*Lashawnda Pugh* (signature)

Lashawnda Pugh employee of
Robert A. Tremain & Associates
Attorneys at Law
Professional Corporation
401 South Old Woodward Avenue, Suite 300
Birmingham, MI 48009-6616
Attorneys for Mortgagee

Subscribed and sworn to before me this 13th day
of October, 2006

*Velena L. Bishop* (signature)

Velena L. Bishop, Notary Public
State of Michigan, County of Oakland
My Commission expires: 08/29/2012
Acting in Oakland County

SMITH, WAYNE
Client: 1044263319
FHA/VA:

ROBERT A. TREMAIN
& ASSOCIATES, P.C.
401 South Old Woodward Avenue
Suite 300
Birmingham, MI 48009-6616
Robert A. Tremain & Associates, P.C. is a debt collector and we are attempting to collect a debt and any information obtained will be used for that purpose.
1044263319/SMITH
MORTGAGE SALE - Default has been made in the conditions of a mortgage made by WAYNE SMITH AND ANDRENA SMITH, HUSBAND AND WIFE to FIRST FRANKLIN FINANCIAL CORP. SUBSIDIARY OF NATIONAL CITY BANK OF INDIANA , Mortgagee, dated April 27, 2004, and recorded on May 12, 2004 , in Liber 49529, on page 2600, in WAYNE County Records, Michigan, and assigned by said mortgage to NATIONAL CITY BANK by an assignment dated March 11, 2005, on which mortgage there is claimed to be due at the date hereof the sum of one hundred twenty one thousand one hundred sixty four and 08/100 Dollars ($121,164.08), including interest at 10.250% per annum WITH AN ADJUSTABLE RATE RIDER.
Under the power of sale contained in said mortgage and the statute in such case made and provided, notice is hereby given that said mortgage will be foreclosed by a sale of the mortgaged premises, or some part of them, at public vendue, at the Jefferson Avenue entrance to the Coleman A. Young Municipal Center in Detroit, MI, at 01:00 PM on October 19, 2006.
Said premises are situated in CITY OF DETROIT, WAYNE County, Michigan and are described as:
LOT 1236, HOLTZMAN AND SILVERMAN SUBDIVISION NO. 7, AS RECORDED IN LIBER 79, PAGE 21 AND 22, OF PLATS, WAYNE COUNTY RECORDS.
The redemption period shall be 6 months from the date of such sale, unless determined abandoned in accordance with 1948CL 600.3241a, in which case the redemption period shall be 30 days from the date of such sale.
DATED: September 20, 2006
Robert A. Tremain & Associates, P.C.
401 South Old Woodward Avenue, Suite 300
Birmingham, MI 48009-6616
ATTORNEY FOR: NATIONAL CITY BANK
Assignee of Mortgagee
For More Information Call:
(248) 540-7701
(9-20)(10-11)

1044263319/SMITH
Non-Military Affidavit Revised 4/21/05

WAYNE,MI
Document: DD SH 45540.347

Page 5 of 7

Printed on 6/5/2007 10:46:36 AM

Comment:

L1-45540      Pa-352

Affidavit Pursuant to 1961 PA 236,
M.C.L.A. 600.3140(3), 600.3240(2), as Amended.

**(THIS AFFIDAVIT IS ONLY APPLICABLE IF THE GRANTEE IN THE RECITED SHERIFF'S DEED IS NATIONAL CITY BANK)**

State of Michigan        )
                         )  ss.
County of Oakland        )

Affiant, being first duly sworn, deposes and says that (s)he is an employee of Robert A. Tremain & Associates, P.C., Attorneys for the Mortgagee/Grantee as recited in a Sheriff's Deed on Mortgage Sale dated 10/19/2006 and recorded concurrently herewith encompassing real property more fully described as:

LOT 1202, HOLTZMAN AND SILVERMAN SUBDIVISION NO. 7, AS RECORDED IN LIBER 78, PAGES 25 AND 26, OF PLATS, WAYNE COUNTY RECORDS

20015 WOODBINE DETROIT, MI 48219
Tax Id# 22-122895025

And,

That, the amount required to redeem the property from the Sheriff's Sale is $77,865.05, as of 10/19/2006, plus $21.87 per day thereafter until redemption is made plus, as permitted by M.C.L.A. 600.3240(4), any additional sums expended by the Grantee since the date of the Sheriff's Sale, including interest thereon, for real estate taxes, assessments, hazard insurance premiums, and redemption of senior liens from foreclosure;

That, redemption must be made within the period as described in the Affidavit of Auctioneer of said Sheriff's Deed on Mortgage Sale;

Page 1 of 2

Branch :ATY,User :9E33      Comment:      Station Id :EZBS

LI-45540    Pu-353

That, a cashier's check only, made payable to and received by the Register of Deeds within the prescribed redemption period, may be accepted at the Register of Deeds office (for an additional fee of $5.00) of the County within which the property is located; or the redemption funds may be paid to the office of Robert A. Tremain & Associates, P.C. or directly to the Grantee. If payment is made to the office of Robert A. Tremain & Associates, P.C. or directly to the Grantee, the cashier's check must be made payable to NATIONAL CITY BANK and received by the office of Robert A. Tremain & Associates, P.C. or the Grantee within the prescribed redemption period. The office of Robert A. Tremain & Associates, P.C. is open 9 a.m. to 5 p.m. Monday through Friday and is located at 401 South Old Woodward Avenue, Suite 300, Birmingham, MI 48009-6616. The phone number is: (248) 540-7701

WARNING: Once the redemption period expires the Grantee may refuse redemption.

That, Robert A. Tremain & Associates, P.C., Attorneys for the Mortgagee/Grantee recited in said Sheriff's Deed on Mortgage Sale will assist a redeeming party in calculating the exact amount required to redeem the property for a fee of $50.00 per request. The phone number is: (248) 540-7701.

Further Affiant sayeth not.

_Lashawnda Pugh_
Lashawnda Pugh, Employee of
Robert A. Tremain & Associates, P.C.

Subscribed and sworn to before me this 13th day of October, 2006

_Valena L. Bishop_
Valena L. Bishop, Notary Public
State of Michigan, County of Oakland
My Commission expires: 08/29/2012
Acting in Oakland County

Drafted by:
Robert A. Tremain (P21554)
Robert A. Tremain & Associates, P.C.
401 South Old Woodward Avenue, Suite 300
Birmingham, MI 48009-6616
(248) 540-7701

(THIS AFFIDAVIT IS ONLY APPLICABLE IF THE GRANTEE IN THE RECITED SHERIFF'S DEED IS NATIONAL CITY BANK)

1044262319/SMITH
Redemption Figure Affidavit Revised 3/25/05

Page 2 of 2

# EXHIBIT C

6 0 1 1 8 0 0 2 JL 19 06



STATE OF
**MICHIGAN**

WAYNE COUNTY
AUGUST 4, 2006
NOT.IPT 492728

**REAL ESTATE
TRANSFER TAX**

$ 144.30-CO
$ 962.50-ST
$TAMP =0058853

$8.00

L1-45931          Pa-668
296374325    7/29/2006    0910OAM
Bernard J. Youngblood
Wayne Co. Register of Deeds

WAYNE 1234785 DEEDS          07/29/06

## WARRANTY DEED
(Statutory Form — Individuals)

Know all persons by these presents, that KENNETH L. HAYNES and DARENDA A. HAYNES
whose address is 20015 WOODBINE, DETROIT, MI 48219

conveys and warrants to, WAYNE SMITH and ARDRENA SMITH
whose address is 20015 WOODBINE, DETROIT, MI 48219

the following described premises situated in the city of Detroit, County of Wayne, State of Michigan to-wit:

LOT 1321, HOLTZMAN AND SILVERMAN SUBDIVISION NO. 7, AS RECORDED IN LIBER 78, PAGES 25
AND 26, OF PLATS, WAYNE COUNTY RECORDS.

COMMONLY KNOWN AS: 20015 WOODBINE, DETROIT, MI 48219
TAX ID#: WARD 22 ITEM 122895.015

For the full consideration of One Hundred Thirty One Thousand and 00/100 ($131,000.00)
Subject to existing building and use restrictions, easements, and zoning ordinances, if any.

Dated:  April 27, 2004

Witnesses:

Caralyn Ricco
_____          _____
Print Name:                        KENNETH L. HAYNES

                                   _____
                                   DARENDA A. HAYNES
_____
Print Name:

State of Michigan
County of Oakland

The foregoing instrument was acknowledged before me on this 27th day of April, 2004, by KENNETH L.
HAYNES and DARENDA A. HAYNES, HUSBAND AND WIFE.

Caralyn Ricco
Notary Public, Oakland County, Michigan
My Commission Expires April 18, 2008
Acting in Oakland County

                              Caralyn Ricco
                              Notary Public
My Commission Expires:        Wayne County, Michigan
                              Oakland

Instrument drafted by:                    When recorded return to:
KENNETH L. HAYNES                         WAYNE SMITH
20015 WOODBINE                            20015 WOODBINE
DETROIT, MI 48219                         DETROIT, MI 48219

Recording Fees: $29.00  County Tax: $   State Transfer Tax $
        $ 84.00

        This is to certify that there are no tax liens or titles
        on this property and that taxes are paid for FIVE
        YEARS previous to date of this instrument.

This is to certify that there are no tax liens or titles
on this property and that taxes are paid for FIVE YEARS
previous to date of this instrument EXCEPT
No. _____          Date _____
                                          JUL 11 2006

                              No. 8346 Cleared _____
                              Treasurer City of Detroit

                              LAND OWNERS TITLE AGENCY
                              34122 WOODWARD AVE.
                              BIRMINGHAM, MI 48009

                              BW 129.00



# EXHIBIT D

Branch :ATY,User :9E83          Comment:                   Station Id :BZBS

**03353877** MAY 1 2 2004

LAND OWNERS TITLE AGENCY
34122 WOODWARD AVE.
BIRMINGHAM, MI 48009

*Right margin vertical text:* LI~40596   P=2500   200294290   05/12/2004   Barnard J. Youngblood MCROD

# MORTGAGE

Return To:
FIRST FRANKLIN FINANCIAL CORPORATION
2150 North First St.
San Jose, CA 95131
Loan number: 0039625013/5,816

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated April 27, 2004
together with all Riders to this document.
(B) "Borrower" is
Wayne Smith
, and Ardeana Smith, husband and wife

Borrower's address is 18240 WESTHAVEN, SOUTHFIELD, Michigan
48075
. Borrower is the mortgagor under this Security Instrument.

MICHIGAN-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT      Form 3023 1/01

-6(MI) (0005)
Page 1 of 16    Initials
VMP MORTGAGE FORMS - (800)521-7291

Document # L074MI

LL-40576                Fn-2501

(C) "Lender" is
First Franklin Financial Corp., subsidiary of National City Bank of Indiana
Lender is a      Corporation
organized and existing under the laws of  Delaware
Lender's address is 2150 North First St.,
San Jose, CA  95131
Lender is the mortgagee under this Security Instrument.
(D) "Note" means the promissory note signed by Borrower and dated  April 27, 2004
The Note states that Borrower owes Lender
ONE HUNDRED SEVENTEEN THOUSAND NINE HUNDRED & 00/100                    Dollars
(U.S. $   117,900.00        ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than  May First, 2034
(E) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

[X] Adjustable Rate Rider      [ ] Condominium Rider           [ ] Second Home Rider
[ ] Balloon Rider              [ ] Planned Unit Development Rider  [X] 1-4 Family Rider
[ ] VA Rider                   [ ] Biweekly Payment Rider      [X] Other(s) [specify]
                                                                   Prepayment Rider

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(K) "Escrow Items" means those items that are described in Section 3.
(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

WS
Initials: ___

-6(MI) (0008)          Page 2 of 16                                    Form 3023 1/01

Document # L075MT

Branch :ATY,User :9D83     Comment:     Station Id :RZBS

Lt-40596    Ps-2602

(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, warrant, grant and convey to Lender and Lender's successors and assigns, with power of sale, the following described property located in the County [Type of Recording Jurisdiction]
of Wayne [Name of Recording Jurisdiction]:
Legal Description attached hereto and made a part hereof
Adjustable Rate Rider attached hereto and made a part hereof
1-4 Family Rider attached hereto and made a part hereof

Prepayment Rider attached hereto and made a part hereof

Parcel ID Number: ward 22 item 122895025
26025 Woodbine
Detroit     which currently has the address of
("Property Address"):     [Street]
[City] , Michigan   48219   [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

-6H(MI) (0009)     Page 3 of 16     Initials: WJ     Form 3023 1/01

Document # L076MI

LI-40876     Pa-2303

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayment shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any;

-6(MI) (0009)        Page 4 of 16     Initials: _____     Form 3023 1/01

Document # L077xCT

Li-40596d          Pa-2504

(c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess Funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

-6(MI) (0608)          Page 6 of 16          Form 3023 1/01

Document # L078RI

LI 40596                Po-2505

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the

Page 6 of 15        Form 3023 1/01

Document # L07 FXI

Branch :ATY,User :9E83          Comment:          Station Id :EZES

Li-40896          Pu-2506

work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

(WI) (0608)          Page 7 of 15          Form 3023 1/04

Document # DJR05IX

WAYNE,MI
Document: MG 40596.2500          Page 7 of 24          Printed on 6/5/2007 10:46:39 AM

Branch :ATY,User :9E83                    Comment:                              Station Id :EZR8

LI-60076          Pg-2307

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance, and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

[initial]          Form 3023 1/01

Page 8 of 18

Document # L081XI

WAYNE,MI
Document: MG 40596.2500                    Page 8 of 24                    Printed on 6/5/2007 10:46:40 AM

Branch :ATY,User :9E83      Command:      Station Id :EZES

Li-40596     Pa-2508

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if

Document # L082MT